UNITED STATES DISTRICT COURT OF THE
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) | MDL No. 2592 <br><br> SECTION: L <br> JUDGE FALLON <br> MAG. JUDGE NORTH |
| MARTA PRESTO, <br><br> *Plaintiff,* <br><br> vs. <br><br> JANSSEN RESEARCH & DEVELOPMENT, LLC; JOHNSON & JOHNSON COMPANY; JANSSEN ORTHO, LLC; JANSSEN PHARMACEUTICALS, INC.; BAYER CORPORATION; BAYER HEALTHCARE AG; BAYER PHARMA AG; BAYER AG; BAYER HEALTHCARE, LLC; BAYER HEALTHCARE PHARMACEUTICALS, INC.; AND DOES 1-100, <br><br> *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | COMPLAINT AND JURY DEMAND <br><br> Civil Action No.:_____ |

## **COMPLAINT AND JURY DEMAND**

COMES NOW, Plaintiff, by and through the undersigned counsel, and hereby submits

this Complaint against Defendants (1) JANSSEN RESEARCH & DEVELOPMENT, LLC f/k/a

Johnson and Johnson Pharmaceuticals Research and Development, LLC; (2) JOHNSON &

JOHNSON COMPANY; (3) JANSSEN ORTHO, LLC; (4) JANSSEN PHARMACEUTICALS,

INC., f/k/a Janssen Pharmaceuticals Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc.; (5)

BAYER CORPORATION; (6) BAYER HEALTHCARE AG; (7) BAYER PHARMA AG; (8)

BAYER AG; (9) BAYER HEALTHCARE, LLC; (10) BAYER HEALTHCARE

PHARMACEUTICALS, INC.; and (11) DOES 1-100 (collectively, "Defendants"), for

1

compensatory and punitive damages, equitable relief, and such other relief deemed just and proper arising from the injuries of the Plaintiff, MARTA PRESTO, as a result of ingesting the product Xarelto®, also known as rivaroxaban, and hereby alleges:

## INTRODUCTION

1.     This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the pharmaceutical drug Xarelto®, Xarelto® in any of its forms is referred to herein as "Xarelto." Plaintiff maintains that Xarelto is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

2.     Defendants concealed their knowledge of Xarelto's defects from the Plaintiff, the FDA, and the general public when representing that Xarelto had been sufficiently tested and was found to be safe and/or effective for its intended use.

3.     Defendants engaged in aggressive direct-to-consumer and physician marketing and advertising campaigns for Xarelto. As a result, Xarelto sales are expected to well exceed $1 billion for the year 2015.

4.     Plaintiff brings claims for compensatory and punitive damages, equitable relief, and such other relief deemed just and proper arising from injuries as a result of ingesting Xarelto.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332, because the amount in controversy as to the Plaintiff exceeds $75,000, exclusive of interest and costs, and because Defendants are citizens of states other than the state in which Plaintiff is a citizen. Specifically, the Plaintiff is a citizen of the State of New York, and the Defendants are

respectively citizens of the States of Delaware, Indiana, and New Jersey, and the Commonwealths of Pennsylvania and Puerto Rico, and the nations of Ireland and Germany.

6.      Venue in this action properly lies in this judicial district as the Judicial Panel on Multi District Litigation has established MDL 2592 and transferred actions to this district. Venue is proper in the court pursuant to 28 U.S.C. § 1391 because Defendants are engaged in marketing, promoting, labeling, and distributing of the product in the State of Louisiana.

7.      At all times hereinafter mentioned, Defendants engaged in interstate commerce in this judicial district in that they advertised, promoted, supplied, and sold certain pharmaceutical products, including Xarelto, to distributors and retailers for resale to physicians, hospitals, medical practitioners, and the general public in this district.

## PARTIES

8.      Plaintiff, MARTA PRESTO, was a resident and a citizen of the State of New York when taking Xarelto.  The injuries suffered by Plaintiff, MARTA PRESTO, as a result of her ingestion of Xarelto, also occurred in the State of New York.

9.      Plaintiff, MARTA PRESTO, was born on ████████████████

10.     Plaintiff, MARTA PRESTO, was prescribed Xarelto on or about February 2016, in the State of New York.

11.     On or about March 10, 2017, Plaintiff presented to UHS Wilson Medical Center, located at 33-57 Harrison Street, Johnson City, New York 13790, with gastrointestinal bleeding and unspecified internal bleeding. At that time, upon information and belief, Plaintiff was admitted to UHS Wilson Medical Center and directed to discontinue her Xarelto prescription. Upon information and belief, Plaintiff was diagnosed with gastrointestinal bleeding and unspecified internal bleeding. She received a blood transfusion, and remained admitted to UHS Wilson Medical Center until approximately March 20, 2017.

12.     Immediately upon her admission to UHS Wilson Medical Center, upon information and belief, Plaintiff's Xarelto prescription was discontinued, and it was recommended that she follow up with her physician upon discharge.

13.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm, including severe pain and suffering, medical expenses, and other economic and non-economic damages.

14.     Defendant JANSSEN RESEARCH & DEVELOPMENT, LLC f/k/a Johnson and Johnson Pharmaceutical Research and Development, LLC, (hereinafter "JANSSEN R&D), is a limited liability company organized under the laws of New Jersey, with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.  JANSSEN R&D's sole member is Centocor Research & Development, Inc., a Pennsylvania corporation with its principal place of business in Malvern, Pennsylvania. JANSSEN R&D is and was at all relevant times involved in the research, development, packaging, labeling, sales, and/or marketing of pharmaceutical products, including Xarelto (rivaroxaban).  JANSSEN R&D is and was at all relevant times a sponsor of the New Drug Application ("NDA") for Xarelto, as well as the supplemental NDAs for Xarelto.

15.     Defendant JOHNSON & JOHNSON, ( hereinafter "J&J"), is a corporation organized under the laws of New Jersey with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.  J&J manufactures, markets, and sells a wide range of pharmaceutical products, including Xarelto (rivaroxaban). J&J is and was at all relevant times involved in the research, development, packaging, labeling, sales, and/or marketing of pharmaceutical products, including Xarelto.

16.     Defendant JANSSEN ORTHO, LLC, (hereinafter "JANSSEN ORTHO"), is a limited liability company organized under the laws of Delaware, having a principal place of

4

business at Stateroad 933 Km O I, Street Statero, Gurabo, Puerto Rico 00778. The sole member

of JANSSEN ORTHO is OMJ PR Holdings, which is incorporated in Ireland and has its

principal place of business in Puerto Rico. JANSSEN ORTHO is and was at all relevant times

involved in the research, development, packaging, labeling, manufacturing, sales, and/or

marketing of pharmaceutical products, including Xarelto.

17.     Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a Janssen Pharmaceutica,

Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc., (hereinafter "JANSSEN

PHARMACEUTICALS"), is a Pennsylvania corporation, having a principal place of business at

1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. JANSSEN

PHARAMCEUTICALS is and was at all relevant times involved in the research, development,

packaging, labeling, manufacturing, sales, and/or marketing of pharmaceutical products,

including Xarelto. At all relevant times, JANSSEN PHARMACEUTICALS has received direct

reports from the FDA, healthcare providers, and the general public of suspected adverse

reactions to Xarelto, and failed to adequately respond to those reports.

18.     Defendant BAYER CORPORATION is an Indiana corporation with its principal

place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. BAYER

CORPORATION is and was at all relevant times involved in the research, development,

packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products,

including Xarelto.

19.     Defendant BAYER HEALTHCARE AG is a pharmaceutical company organized

under the laws of Germany with its principal place of business located in Leverkusen, Germany.

BAYER HEALTHCARE AG is and was at all relevant times involved in the research,

development, packaging, labeling, testing, manufacturing, sales, and/or marketing of

pharmaceutical products, including Xarelto.

20.     Defendant BAYER PHARMA AG f/k/a Bayer Schering Pharma AG is a German corporation with its principal place of business in Leverkusen, Germany.  BAYER PHARMA AG is and was at all relevant times involved in the research, development, packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products, including Xarelto.

21.     Defendant BAYER AG is a German corporation with its principal place of business in Leverkusen, Germany.  BAYER AG is and was at all relevant times involved in the research, development, packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products, including Xarelto.

22.     Defendant, BAYER HEALTHCARE, LLC, (hereinafter "BAYER HEALTHCARE"), is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Whippany, New Jersey. BAYER CORPORATION is the sole member of BAYER HEALTHCARE.  Defendant BAYER HEALTHCARE is and was at all relevant times involved in the research, development, packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products, including Xarelto.

23.     Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. f/k/a Bayer Healthcare, Inc., (hereinafter "BAYER HEALTHCARE PHARMACEUTICALS"), is a corporation organized under the laws of the State of Delaware, with its principal place of business in Pine Brook, New Jersey.  BAYER HEALTHCARE PHARMACEUTICALS is and was at all relevant times involved in the research, development, packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products, including Xarelto.  BAYER HEALTHCARE PHARMACEUTICALS is and was at all relevant times a sponsor of the New Drug Application ("NDA") for Xarelto, as well as the supplemental NDAs for Xarelto.

24.    At all relevant times, Defendants conducted business in the State of New York in that the Defendants derived substantial revenue from goods and products sold in the State of New York.

25.    Does 1-100 are corporations, organizations, and/or individuals who at all relevant times were involved in the research, development, manufacturing, sales, and/or marketing of pharmaceutical products, including Xarelto.

## FACTUAL BACKGROUND

26.    At all relevant times, Defendants were in the business of and did design, research, manufacture, test, package, label, advertise, promote, market, sell, and distribute Xarelto.

27.    Defendants received FDA approval for Xarelto on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

28.    Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

29.    An additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

30.    Defendants began marketing and selling Xarelto in the United States in 2011.

31.    Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet dose of 20mg, 15mg, and 10mg.

32.    Approval of Xarelto for the prophylaxis of DVT and PE patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Vein Thrombosis and Pulmonary Embolism studies (the "RECORD" studies). The RECORD studies, however,

7

showed a greater incidence with Xarelto of major bleeding events, leading to decreased hemoglobin levels and transfusion of blood. The increased incidence of major bleeding events occurred despite exclusion from the clinical trials patients who were identified as having a high risk of bleeding and despite Defendants' failures to report significant adverse events and falsifications of adverse event documentation. (Lassen, M.R. et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty*, 358:26 N. Engl. J. Med. 2776-86 (2008); Kakkar, A.K., et al. *Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty; a double-blind, randomised controlled trial*. Lancet 2008; 372:31-39; Ericksson, B.1., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty*. 358:26 N. Engl. J. Med. 2765-75 (2008)).

33.    The term "major bleeding" as used in the RECORD studies was defined as "bleeding that was fatal, that involved a critical organ, or that required reoperation or clinically overt bleeding outside the surgical site that was associated with a decrease in the hemoglobin level of 2g or more per deciliter or requiring infusion of 2 or more units of blood." Defendants, who funded and had direct involvement in the design and conduct of the studies, ensured that the studies were not designed to accurately assess differenced in bleeding risk between Xarelto and other anticoagulants, and further ensured that the studies were designed to under-represent the true bleeding risk presented by Xarelto use.

34.    Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study ("ROCKET AF"). The study's findings reported that rivaroxaban was non-inferior to warfarin for the

8

prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including uppper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrilltaion*. 365:10 N. Engl. J. Med. 883-91 (2011). ROCKET 11)).

35.    Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto might be an option for treatment of DVT, but that Xarelto carried an obvious increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism*, 363:26 N. Engl. J. Med. 2499-510 (2010)). The EINSTEIN-Extension study reiterated that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study)*. Expert Rev. Cardiovasc. Ther. 9(7), 841-44 (2011)).

36.    The EINSTEIN-PE study also reported, however, an increased risk of adverse events in users of Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-PE Investigators. *Oral Rivaroxaban for the Treatment a/Symptomatic Pulmonary Embolism*. N. Engl. J. Med. 2012; 366:1287-97).

37.    Defendants have used the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which have touted the positive results of those studies. However,

Defendants' promotional materials have failed to similarly highlight the increased risk of major internal bleeding, among other serious bleeding concerns.

38.    Defendants marketed Xarelto as a new oral anticoagulant treatment that is a more convenient alternative to warfarin (coumadin), a long-established safe treatment for preventing stroke and systemic embolism.  Defendants emphasized the supposed benefits of treatments with Xarelto over warfarin, which they referred to as the Xarelto Difference - namely, that Xarelto does not require monitoring with blood tests, that its effect is the same on all patients, and that it does not limit a patient's diet.

39.    For example, in advertising Xarelto on Defendant JANSSEN's website, the Defendant states:

> With XARELTO®, blood tests aren't typically necessary to set your starting dose, and you don't need to scheduled regular blood tests throughout your treatment to have your dosage adjusted.  **So instead of spending time monitoring your blood, you can do more of the things you enjoy**. (emphasis added).

40.    This emphasis on convenience is dangerously misleading and it negated the already inadequate language in Xarelto's labeling concerning the risk of bleeding.

41.    In its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

42.    Importantly. there is no antidote to Xarelto, unlike warfarin or coumadin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent.  The original U.S. label approved when the drug was first marketed in the U.S. did not contain a warning regarding Xarelto's lack of antidote, but instead only mentioned this important fact in

the overdosage section.  Months passed before this information was added to the "Warnings and Precautions" section.

43.    There is a feasible alternative to Xarelto in the form of anticoagulants for which there is an established antidote, i.e., reversal agent, and for which there is an established blood monitoring protocol.  The lack of these attributes in Xarelto rendered its design defective, which was a substantial factor in causing Plaintiff's injuries.  Today, Defendants are searching frantically for an antidote that they should have developed before releasing Xarelto into the market.

44.    Defendants spent significant money in promoting Xarelto, which included at least $11,000,000 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S.  In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

45.    As a result of Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

46.    Defendants' website for Xarelto claims that over seven (7) million people worldwide have been prescribed Xarelto.  In the United States, approximately $1 million Xarelto prescriptions had been written by the end of 2013.

47.    During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide.  Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 billion for the fiscal year.  Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

48.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer advertising campaigns that were designed to influence patients, including Plaintiff, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

49.     In the course of these direct-to-consumer advertisements, Defendants overstated the efficacy of Xarelto, misleadingly suggested that no blood monitoring was required, failed to adequately disclose to patients that there is no antidote for Xarelto, and that such irreversibility could have permanently disabling, life-threatening, and fatal consequences.

50.     On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion, ("OPDP"), regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations.  The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

51.     Prior to Plaintiff's prescription of Xarelto, the Plaintiff became aware of the representations in the promotional materials described herein.

52.     Prior to Plaintiff's prescription of Xarelto, her prescribing physician became aware of the representations in the promotional materials and information from sales representatives of Defendants that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians of the risks of major internal bleeding events and that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

53.    Prior to Plaintiff's prescription of Xarelto, the Plaintiff became aware of the representations in the promotional materials described herein.

54.    Prior to Plaintiff's prescription of Xarelto, her prescribing physician became aware of the representations in the promotional materials and information from sales representatives of Defendants that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians of the risks of major internal bleeding events and that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

55.    At all times relevant hereto, Defendants also failed to adequately warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

56.    At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto, that failure to monitor patients' blood while taking Xarelto can result in life-threatening thrombotic events on one hand and serious bleeding events on the other, and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

57.    In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65

deaths. Of the reported hemorrhage events associated with Xarelto, 8 resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

58.     At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to 56 deaths associated with warfarin.

59.     The Institute for Safe Medicine Practices, ("ISMP"), referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

60.     Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

61.     Moreover, on a global scale, in the first eight months of 2013, German regulators received Xarelto-related adverse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

62.     Despite the clear signal generated by the SAE data, Defendants failed to either alert the public and the scientific community, or perform further investigation into the safety of Xarelto.

63.     Defendants' labeling and prescribing information for Xarelto:

    a.     Failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

     b.     Failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects of the degree of anticoagulation in a patient and among patients;

     c.     Originally failed to disclose in the "Warnings" Section that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto;

     d.     Failed to advise prescribing physicians, such as the Plaintiff's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

     e.     Failed to instruct prescribing physicians and patients on how to determine proper dosing;

     f.     Failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

     g.     Failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

     h.     Failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially in those patients with a prior history of gastrointestinal issues and/or upset;

     i.     Failed to provide adequate warnings regarding the increased risk of suffering a bleeding event requiring blood transfusions in those taking Xarelto;

     j.     Failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

66.     Defendants designed their studies to under-represent the true risk of adverse bleeding events, and they failed to conduct proper studies that they knew or should have known would have disclosed the true risks.

67.     From the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiff's prescribing physicians or Plaintiff that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had no adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

68.     Defendants concealed and failed to completely disclose its knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as its knowledge that they had failed to fully test or study said risk.

69.     Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

70.     Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

**PLAINTIFF'S USE OF XARELTO**

71.     On or about February 2016, Plaintiff, MARTA PRESTO (hereinafter "Ms. Presto"), was prescribed Xarelto for atrial fibrillation based upon Defendants' representations herein concerning the convenience of Xarelto treatment.

72.     On or about March 10, 2017, Plaintiff presented to UHS Wilson Medical Center, located at 33-57 Harrison Street, Johnson City, New York 13790, with gastrointestinal bleeding and unspecified internal bleeding. At that time, upon information and belief, Plaintiff was

admitted to UHS Wilson Medical Center and directed to discontinue her Xarelto prescription. Upon information and belief, Plaintiff was diagnosed with gastrointestinal bleeding, and unspecified internal bleeding. She received a blood transfusion, and remained admitted to UHS Wilson Medical Center until approximately March 20, 2017.

73.    Immediately upon her admission to UHS Wilson Medical Center on or about March 10, 2017, upon information and belief, Plaintiff's Xarelto prescription was discontinued, and it was recommended that she follow up with her physician upon discharge.

74.    By reason of the foregoing acts and omissions of Defendants, the Plaintiff, Ms. Presto, was caused to suffer life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications, and fear of developing any of the above-named health consequences.

75.    By reason of the foregoing, Plaintiff has been severely and permanently injured, and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Xarelto drug.

## FIRST CAUSE OF ACTION AS AGAINST THE DEFENDANTS (NEGLIGENCE)

76.    Plaintiff repeats, reiterates, and realleges each and ever allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

77.    Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, and/or distribution of Xarelto into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

78.    Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Xarelto into interstate commerce in that Defendants knew or should have known that using Xarelto created a high risk of unreasonable, dangerous side effects, including, life threatening bleeding, stroke, deep vein thrombosis, pulmonary embolism, liver injury, kidney injury, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

79.    The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.    Designing, manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

b.    Designing, manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

c.    Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use, in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

d.    Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

e.    Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

f.    Failing to provide adequate instructions regarding blood monitoring and safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

19

g.    Failing to test Xarelto and/or failing to adequately, sufficiently, and properly test Xarelto;

h.    Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

i.    Negligently representing that Xarelto was safe for use for its intended purpose when, in fact, it was and is unsafe;

j.    Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

k.    Negligently designing Xarelto in a manner which was dangerous to its users;

l.    Negligently manufacturing Xarelto in a manner which was dangerous to its users;

m.    Negligently producing Xarelto in a manner which was dangerous to its users;

n.    Negligently assembling Xarelto in a manner which was dangerous to its uses;

o.    Concealing information from the Plaintiff in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations; and

p.    Improperly concealing and/or misrepresenting information from the Plaintiff, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk

of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

80.     Defendants under-reported, underestimated, and downplayed the serious dangers of Xarelto.

81.     Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

82.     Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packing, distributing, testing, advertising, warning, marketing, and sale of Xarelto in that they:

   a.     Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

   b.     Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

   c.     Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

   d.     Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

   e.     Failed to include a black box warning concerning the irreversible bleeding risks associated with Xarelto;

21

f.    Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

g.    Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto; and

h.    Failed to warn Plaintiff, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects.

83.    Despite the fact that Defendants knew or should have known that Xarelto caused unreasonably dangerous side effects, Defendants continued and continue to negligently and misleadingly market, manufacture, distribute, and/or sell Xarelto to consumers, including the Plaintiff.

84.    Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

85.    Defendants' negligence was the proximate cause of Plaintiff's injuries, harm, and economic loss, which Plaintiff suffered and/or will continue to suffer.

86.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

22

87.     As a result of the foregoing acts and omissions, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses.  Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

88.     By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## SECOND CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (STRICT PRODUCTS LIABILITY)

89.     Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

90.     At all times hereinafter mentioned, the Defendants designed, researched, manufactured, tested advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Xarelto as hereinabove described that was used by the Plaintiff.

91.     That Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

92.     At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

93.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that,

when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

94.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

95.     At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the firm and manner as provided by the Defendants.

96.     Defendants knew, or should have known, that at all times herein mentioned its Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

97.     At the time of the Plaintiff's use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended.

98.     Defendants with this knowledge voluntarily designed its Xarelto in a dangerous condition for use by the public, and, in particular, the Plaintiff herein.

99.     Defendants had a duty to create a product that was not reasonably dangerous for its normal, intended use.

100.    Defendants created a product unreasonably dangerous for its normal, intended use.

101.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

102.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

103.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonably risk to the health of consumers and to the within Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

104.    The Plaintiff could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

105.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects, including life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

106.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

107.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or

consumers of the product, and continued to improperly advertise, market, and/or promote their product, Xarelto.

108. By reason of the foregoing, the Defendants have become strictly liable in tort to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

109. Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

110. The defects in Defendants' drug, Xarelto, were a substantial factor in causing the Plaintiff's injuries.

111. As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental aguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

112. As a result of the foregoing acts and omissions of Defendants, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

113. By reason of the foregoing, the Plaintiff has been damages by Defendants' wrongful conduct.

## THIRD CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (BREACH OF EXPRESS WARRANTY)

114.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

115.    Defendants expressly warranted that Xarelto was safe and well accepted by users and did not require blood monitoring and was safe even though it had no antidote.

116.    Xarelto does not conform to these express representations because Xarelto is not safe and has numerous serious side effects, many of which were not accurately warned about by Defendants.  As a direct and proximate result of the breach of said warranties, Plaintiff suffered and/or will continue to suffer severe and permanent personal injuries, harm, and economic loss.

117.    Plaintiff did rely on the express warranties of the Defendants herein.

118.    Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Xarelto in recommending, prescribing, and/or dispensing Xarelto.

119.    The Defendants herein breached the aforesaid express warranties, as their drug Xarelto was defective.

120.    Defendants expressly represented to Plaintiff, her physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement

27

surgery, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

121.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries, and even death, to users that were not accurately identified and represented by Defendants.

122.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

123.    By reason of the foregoing, Plaintiff has been severely and permanently injured, and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Xarelto drug.

124.    As a result of the foregoing acts and omissions, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses.  Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

125.    By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## FOURTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (BREACH OF IMPLIED WARRANTIES)

126.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

127.    At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Xarelto and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

128.    At the time Defendants marketed, sold, and distributed Xarelto for use by the Plaintiff, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

129.    The Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

130.    That said representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

131.    Plaintiff, and/or members of the medical community and/or healthcare professionals, did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

132.    Plaintiff and her physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality and safe and fit for its intended use.

133.    Xarelto was placed into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

134.    The Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses.

135.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

136.    As a result of the foregoing acts and omissions of the Defendants, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses.  Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

137.    By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## FIFTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (FRAUDULENT MISREPRESENTATION)

138.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

139.    The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiff, and/or the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.  Defendants further misrepresented that the patients could safely use Xarelto without any blood monitoring, that Xarelto's effect is the same on all parties, and that Xarelto could safely be used without an antidote.

140.    The representations made by Defendants were, in fact, false.

141.    When said representations were made by Defendants, the Defendants knew those representations to be false, or, at a minimum, Defendants willfully, wantonly, and recklessly disregarded whether the representations were true.

142.    These representations were made by said Defendants with the intent of defrauding and deceiving the Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense, and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of

31

which evinced a callous, reckless, willful, depraved indifference to the health, safety, and welfare of the Plaintiff herein.

143.    At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiff used Xarelto, the Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

144.    In reliance upon said representations, the Plaintiff was induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries, and/or being at an increased risk of sustaining severe and permanent personal injuries in the future.

145.    Said Defendants knew and were aware or should have been aware that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

146.    Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that is was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings and misleading instructions.

147.    Defendants brought Xarelto to the market, and acted fraudulently, wantonly, and maliciously to the detriment of the Plaintiff.

148.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

149.    As a result of the foregoing acts and omissions, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related

expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

150. By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## SIXTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (FRAUDULENT CONCEALMENT)

151. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

152. At all times during the course of dealing between Defendants and Plaintiff, and/or her healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto for its intended use.

153. Defendants knew or were reckless in not knowing that its representations were false.

154. In their representations to Plaintiff and/or her healthcare providers, and/or the FDA, Defendants fraudulently concealed and intentionally omitted the following material information:

    a.    That Xarelto was not safe as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

    b.    That the risks of adverse events with Xarelto were higher than those with other forms of treatment for reducing the risk of stroke and systemic embolism in patients

with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

      c.     That the risks of adverse events with Xarelto were not adequately tested and/or known by Defendants;

      d.     That Defendants were aware of dangers in Xarelto, in addition to and above and beyond those associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

      e.     That Xarelto was defective, and that it caused dangerous side effects, including, but not limited to, life-threatening bleeding, as well as other severe and permanent health consequences, in a much more and significant rate than other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

      f.     That patients needed to undergo blood monitoring while using Xarelto;

      g.     That Xarelto's effect on blood coagulation varies among different patients and can vary within the same patient at different times;

      h.     That Xarelto cannot be safely used without an available antidote;

      i.     That Defendants were aware that healthcare providers would not be in a position to reduce the risks of harm associated with Xarelto in accordance with the instructions provided by Defendants;

      j.     That Xarelto's effect on patients' blood coagulation varies;

      k.     That Xarelto cannot be used safely without an available antidote;

l.      That Xarelto was manufactured negligently;

m.     That Xarelto was manufactured defectively;

n.      That Xarelto was manufactured improperly;

o.      That Xarelto was designed negligently;

p.      That Xarelto was designed defectively; and

q.      That Xarelto was designed improperly.

155.    Defendants were under a duty to disclose to Plaintiff, and his physicians, hospitals, healthcare providers, and/or the FDA the defective nature of Xarelto, including, but not limited to, the heightened risks of life-threatening bleeding.

156.    Defendants had sole access to and exclusive control of material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto, including the Plaintiff, in particular.

157.    Defendants' concealment and omissions of material facts concerning, inter alia, the safety of Xarelto was made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff and his physicians, hospitals, and healthcare providers into reliance, continued use of Xarelto, and actions thereon, and to cause them to purchase, prescribe, and/or dispense Xarelto and/or use the product.

158.    Defendants knew that Plaintiff, and her physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included materials omissions of facts surrounding Xarelto, as set forth herein.

159.    Plaintiff, as well as her doctors, healthcare providers, and/or hospitals reasonably relied on facts revealed which negligently, fraudulently, and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

35

160.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

161.    As a result of the foregoing acts and omissions, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses.  Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

162.    By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## SEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (NEGLIGENT MISREPRESENTATION)

163.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

164.    Defendants had a duty to represent to the medical and healthcare community, and to the Plaintiff, the FDA, and the public in general, that said product, Xarelto, had been tested and found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

165.    The representations made by Defendants were, in fact, false.

166.    Defendants failed to exercise ordinary care in the representation of Xarelto, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution of

said product into interstate commerce, in that Defendants negligently misrepresented Xarelto's high risk of unreasonably, dangerous side effects.

167.    Defendants breached their duty in representing Xarelto's serious side effects to the medical and healthcare community, to the Plaintiff, the FDA, and the public in general.

168.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries, which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

169.    As a result of the foregoing acts and omissions, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses.  Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

170.    By reason of the foregoing, the Plaintiff has been damaged by the Defendants' wrongful conduct.

### EIGHTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
### (MOLATION OF THE NEW YORK GENERAL BUSINESS LAW §349)

171.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

172.    Pursuant to General Business Law §349(h), Defendants' marketing of Xarelto comprises deceptive acts and practices within the meaning of applicable law, including but not limited to the following:

a.    Representing to Plaintiff, her physicians, and the general public that its Xarelto medication was safe, fit, and effective for all patients, that Xarelto's effect on all patients was the same, that Xarelto could be used safely without blood monitoring, and that Xarelto could be used safely without an antidote, knowing that said representations were false;

b.    Concealing from Plaintiff, her physicians, and the general public that its Xarelto had a serious propensity to cause injuries to users;

c.    Engaging in advertising programs designed to create the image, impression, and belief by consumers and physicians that the use of Xarelto as marketed was safe, and had fewer side effects and adverse reactions than other options for anticoagulant medication, even though the Defendants knew these to be false, and/or had no reasonable grounds to believe them to be true;

d.    Purposely downplaying and understating the health hazards and risk associated with Xarelto.

173.    These representations made in advertising and promoting Xarelto were false and misleading.

174.    Defendants knew that these representations of fact were false and misleading at the time the representations were made, or at the very least with reckless disregard to whether the representations were true or false.

175.    Defendants' representations were made to the general public, including Plaintiff, and Plaintiff's doctors, in an effort to induce the widespread use of Xarelto.

176.    Plaintiff and her doctors justifiably relied upon these representations when deciding to take and prescribe Xarelto.

177.   The illegal conduct alleged herein is continuing and there is no indication that Defendants will refrain from such activity in the future.

178.   Pursuant to the applicable law, Plaintiff is entitled to damages, injunctive relief, attorneys' fees, and any other relief this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment of the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against the Defendants on each of the above-referenced claims and causes of action as follows:

a.    For general damages in a sum in excess of the jurisdictional minimum of this Court;

b.    For medical, incidental, and hospital expenses according to proof;

c.    For pre-judgment and post-judgment interest as provided by law;

d.    For full refund of all purchase costs that Plaintiff paid for Xarelto;

e.    For consequential damages in excess of the jurisdictional minimum of this Court;

f.    For compensatory damages in excess of the jurisdictional minimum of this Court;

g.    For punitive damages in an amount in excess of any jurisdictional minimum of this Court in an amount sufficient to deter similar conduct in the future;

h.    For attorneys' fees, expenses, and costs of this action; and

i.    For such other and further relief as this Court deems necessary, just, and proper.

Dated: _April 14_____, 2017

KENNY & KENNY, PLLC

By: _____
Michael P. Kenny, Esq.
Bar Registration ID: 103123
315 West Fayette Street
Syracuse, New York 13202
Telephone: (315) 471-0524
Facsimile: (315) 471-4238
E-Mail: mpkennyesq@msn.com